# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | | |
|---|---|---|
| **DON ANTHONY ROMERO** | * | **CIVIL ACTION NO. 14-3001** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation, pursuant to this Court's Standing Order of July 8, 1993.  Don Anthony Romero, born January 3, 1964, filed applications for a period of disability and disability insurance benefits on June 18, 2008, alleging disability as of February 15, 2007, due to narcolepsy, arthritis, back pain, migraines, unexplained weight loss, depression and anxiety.  On June 24, 2010, Administrative Law Judge ("ALJ") Kim Fields issued a partially favorable decision finding that claimant was disabled from February 15, 2007 through April 19, 2009.  (Tr. 121-33).  After claimant filed a request for review, the Appeals Council issued an Order vacating the ALJ's decision and remanding the case for further administrative action.  (Tr. 141-46).

On remand, ALJ Fields presided over claimant's second administrative hearing held on March 4, 2013.  (Tr. 11).  On March 27, 2013, the ALJ issued an unfavorable decision denying claimant's claim for benefits.  (Tr. 8-27).  After the Appeals Council denied claimant's request for review on August 19, 2014 (Tr. 1-4), claimant filed an action for judicial review in this Court on October 13, 2014.

## FINDINGS AND CONCLUSIONS

## I. STANDARD OF REVIEW

The Court limits its review of a denial of disability insurance benefits to two issues: (1) whether the Secretary applied the proper legal standards, and (2) whether the Secretary's decision is supported by substantial evidence on the record as a whole. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Wingo v. Bowen*, 852 F.2d 827, 829 (5th Cir. 1988).

The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 1422, 28 L.Ed.2d 842 (1971). Substantial evidence is defined as more than a mere scintilla. *Id*., 402 U.S. at 401, 91 S.Ct. at 1427. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*.

The Court may not, however, reweigh the evidence or substitute its judgment for that of the administrative fact finder. *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985). If substantial evidence supports the administrative finding, the Court may then only review whether the administrative law judge applied the proper legal standards and conducted the proceedings in conformity with the applicable statutes and regulations. *Id*. at 393.

## II. BURDEN OF PROOF

Disability is defined as " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). The existence of such disability must be demonstrated by medically acceptable

2

clinical and laboratory diagnostic findings, and the overall burden of proof rests upon the claimant.  *Cook,* 750 F.2d at 393.

The Commissioner uses a sequential, five-step approach to determine whether a claimant is so disabled.  *Ramirez v. Colvin*, 606 F. App'x 775, 778 (5th Cir. 2015).  The steps include: (1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The burden of proof is on the claimant at the first four steps.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  The burden of proof shifts to the Commissioner at the fifth step to establish the existence of other available substantial gainful employment that a claimant can perform.  *Fraga v. Bowen*, 810 F.2d 1296, 1301-02 (5th Cir. 1987).  If the Commissioner identifies such employment, the burden shifts back to the claimant to prove that he could not perform the alternative work identified.  *Id*. at 1302.  Throughout the process, the ultimate burden of establishing disability remains with the claimant.  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983).

## III. ANALYSIS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability.

3

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence, based on the following:

### A. Medical Evidence[1]

Claimant was treated by Dr. David E. Nachimson, a rheumatologist, for undifferentiated seronegative oligoarthritis.[2]  (Tr. 451).  He reported on May 19, 2007, that his symptoms, including musculoskeletal complaints, had improved significantly since he had quit his job.  He had lost 26 pounds over the previous two months.

Examination revealed trace synovitis in the right shoulder, wrist and hip, and mild osteoarthritic changes in the hands.  (Tr. 452).  The diagnosis was chronic oligoarthritis.  Dr. Nachimson noted that "[i]mprovement in his symptoms with change in psych meds and stress reduction strongly suggests that there may be a significant psychogenic component at play here with respect to his chronic joint pain."

Claimant returned on September 19, 2007, with complaints of pain, swelling and stiffness in his hands and wrists, particularly on his right side, and chronic pain in his lower back and hips.  (Tr. 453).  The assessment was inflammatory polyarthropathy.  (Tr. 454).  He was given a Depomedrol injection.

---

[1]Although all of the medical evidence was reviewed, only those relating to the arguments are summarized herein.

[2]Extended oligoarthritis is defined as arthritis affecting a total of more than 4 joints after the first 6 months of disease.  https://en.wikipedia.org/wiki/Oligoarthritis (last visited 2/11/16).

On October 22, 2007, claimant had responded to the injection. (Tr. 456). He was also started on Methotrexate,[3] which he seemed to be tolerating. X-rays of the hands, wrists, hips/SI (sacroiliac) joints and chest were negative, except for mild hypertropic changes bilaterally in the distal interphalangeal joints (DIPs). (Tr. 466).

On examination, claimant's wrists had 2+ synovitis with questionable effusion, tenderness and swelling over the wrist joints, and early Heberden's nodes (bony growths) on the second left and third right DIPs. (Tr. 457). The assessment was inflammatory polyarthropathy NOS and acute exacerbation of seronegative polyarthritis. He was given a Depomedrol injection.

On March 17, 2008, claimant complained of joint swelling, wrist pain, and back pain. (Tr. 460). Lumbar x-rays showed subtle posterior disc space narrowing at L3-4 and L4-5 suggesting early spondylosis, but no lumbar osseous trauma or spondylolisthesis. (Tr. 469). X-rays of the SI joints were negative. (Tr. 470).

On examination, claimant had wrist tenderness and swelling of the thumb extensor tendon sheath in both hands. The assessment was early seronegative RA (rheumatoid arthritis) versus seronegative spondyloarthropathy and De Quervains Tenosynovitis,[4] right more symptomatic than left. (Tr. 461). He was given an injection.

On May 23, 2008, claimant complained of pain in the right wrist and both thumbs, left shoulder, neck and low back. (Tr. 462). Dr. Nachimson noted that claimant denied any specific

---

[3]Methotrexate is used to treat adults with severe rheumatoid arthritis. http://www.mayoclinic.org/drugs-supplements/methotrexate-injection-route-subcutaneous-route/description/drg-200 64776 (last visited 2/10/16).

[4]De Quervain's tenosynovitis is a painful condition affecting the tendons on the thumb side of the wrist. http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/basics/definition/con-20027238 (last visited 2/10/16).

incident, although "he does play a lot of golf."  The assessment was rheumatoid arthritis and shoulder bursitis/tendonitis.  (Tr. 463).  He was given an injection.

An MRI of the right wrist dated June 4, 2008, revealed suspected carpal rheumatoid arthritis associated with a mixed pattern of osteoarthritis and rheumatoid arthritis across the thumb base and fourth CMC (carpometacarpal) joint.  (Tr. 471).

Claimant also complained of a sleep impairment.  On October 16, 2006, he saw Dr. Kevin Hargrave, a neurologist.  (Tr. 510).  He reported falling asleep at work a few times in the previous week.  Dr. Hargrave's assessment was possible narcolepsy and insomnia.

On January 16, 2007, claimant returned with complaints of increased fear, anxiety, depression and stress.  (Tr. 509).  Elavil was not helping withe sleep.  The assessment was chronic insomnia, headaches, and depression.  Dr. Hargrave noted that prior sleep studies showed features of narcolepsy.  He prescribed Ambien, Wellbutrin and Provigil.

Claimant returned on July 16, 2007, with complaints of sleep difficulties, lethargy and tiredness in the daytime, increased personal stress and headaches, panic attacks and uncontrollable crying.  (Tr. 508).  Dr. Hargrave's assessment was chronic insomnia, fatigue, chronic pain and headaches, depression, and major life changes.  He refilled claimant's prescription for Ambien CR.

On March 4, 2008, claimant complained of lethargy and decreased energy, nausea, headaches, agitation and photosensitivity.  (Tr. 507).  Dr. Hargrave prescribed Xyrem for possible narcolepsy.  On April 8, 2008, claimant's EDS/narcolepsy was better on Xyrem.  (Tr. 506).

Claimant reported on August 6, 2008, that Xyrem had worked well at first, then he regressed.  (Tr. 505).  An MRI revealed a mild diffuse broad-based annular disc bulge at L4-5 with mild narrowing of the inferior aspects of the neural foramina bilaterally, and no evidence of focal disc protrusion, spinal stenosis, or abnormality of alignment.  (Tr. 511).  The assessment was lumbar pain with worrisome findings on MRI, chronic headaches, mood dysfunction and fibromyalgia.  Dr. Hargrave discontinued Xyrem.

D.T. Savoy, D.C., wrote a letter dated September 3, 2008, to the Department of Social Services, indicating that he had seen claimant in April, 2005, for complaints of lower back, left cervical, upper thoracic, neck and bilateral thumb pain.  (Tr. 580).  Examination demonstrated pain, tenderness and spasm of the left lower cervical and trapezious region and bilateral lumbosacral region.  Range of motion of the lumbar spine demonstrated moderate pain and loss of motion in right and left lateral flexion and right rotation.  Cervical spine examination demonstrated a positive left shoulder depression with moderate pain and a positive double straight leg raiser with moderate pain in the lumbar spine.

X-rays showed degenerative joint disease from C5-C7.  Lumbar MRI demonstrated L4-L5 disc dessication and L5-S1 facet joint degeneration.

Dr. Savoy opined that claimant's condition of his cervical and lumbar spine was aggravated by prolonged sitting and lifting.  His hand pain prevented him from lifting heavy objects or gripping tightly.  Dr. Savoy stated that claimant should not carry over 20 pounds.

On November 1, 2008, claimant was consultatively examined by Dr. Stephanie Abron, an internist, for complaints of back, hand, neck and wrist pain; depression and anxiety; hypertension; carpal tunnel syndrome with release, and removal of squamous cell carcinoma of

7

the left ear.  (Tr. 556).  Claimant could dress and feed himself; stand for 15-20 minutes and a total of four to six out of eight hours; sit for 35 minutes; lift five pounds; drive for 35-40 minutes, and do household chores of sweeping, shopping, mopping, vacuuming, cooking and dishes.  His medications included Provigil, Ambien CR, Benicar, Xanax, Diclofenac, Darvocet N, Ultram ER, Abilify, Lexapro, Protonix, Astelin spray, Nasonex, Benadryl as needed, Volatren gel and Mucinex as needed.  (Tr. 557).

On examination, claimant's blood pressure was 143/99.  Grip strength was 5/5 bilaterally. (Tr. 558).  His right wrist still had a little bit of positive Phalen's.  Motor strength was 5/5, sensation was intact, and deep tendon reflexes were 2+.

Dr. Abron's impression was generalized osteoarthritis in the back, wrists, and hand joints. Carpal tunnel syndrome was noted on the right hand, but without any significant atrophy.  He also had depression and anxiety, for which he was being followed; hypertension, for which he was on medication, and no sign of cancer recurrence.

Dr. Abron noted that claimant was able to ambulate on his own without an assistive device.  She did not see any end-organ damage from the hypertension, and no swelling in the hands, knees and feet.  Claimant acted very appropriately without any agitation or anxiety on mental exam.  (Tr. 559).

On November 12, 2008, claimant saw Dr. Ladislas Lazaro, IV, a rheumatologist, for complaints of diffuse arthralgias and myalgias, and pain in the hands and low back.  (Tr. 569). He also reported severe anxiety and depressive disorder.  He was taking Diclofenac, which he found helped the hand pain greatly, and used Darvocet as needed for severe pain.  (Tr. 570). Votaren gel helped the hand as well.

8

On examination, claimant had a moderate amount of squaring at the first CMC with 1-2+ tenderness.  (Tr. 571).  He had tenderness in the shoulder, trapezius and rhomboid area. Fibromyalgia trigger points were present at the cervical spine, trapezius, supraspinatus, costosternal junctions, lateral epicondyles, and greater trochanters bilaterally.

Dr. Lazaro's impressions were DJD (degenerative joint disease) at the CMC on the right; degenerative arthritis in the right thumb; rotator cuff tendonitis in the left shoulder; fibromyalgia with multiple trigger points present, and severe anxiety and depressive disorder with insomnia and fatigue.  Dr. Lazaro noted that claimant had "quite a severe imbalance between the physical demands created by the mind and the physical supply available through the body."  He recommended physical therapy for the fibromyalgia, meditation and stress reduction.

Lab tests taken on November 13, 2008, revealed a high rheumatoid arthritis factor.  (Tr. 574).

On March 25, 2009, claimant was doing very well with his fibromyalgia.  (Tr. 576).  His Lyrica was increased.

Claimant returned to Dr. Hargrave on February 10, 2009, with complaints of afternoon sleepiness.  (Tr. 620).  The assessment was EDS (excessive daytime sleepiness)/narcolepsy, depression, chronic headaches and fibromyalgia.

On August 10, 2009, claimant complained that he was still very tired.  (Tr. 617).  Dr. Hargrave's assessment was excessive daytime sleepiness.  He prescribed Methylphenidate (Ritalin).

Lab tests dated September 2, 2009, were negative for narcolepsy.  (Tr. 625).  Dr. Hargrave noted that these results made narcolepsy unlikely.

9

Dr. Lazaro completed a Treating Physician Questionnaire on December 1, 2009, in which he indicated that claimant could occasionally lift and carry less than 10 pounds; stand 30 minutes at one time; walk one to two city blocks without symptoms; stand/walk about four hours, and sit for 45 minutes and a total of four hours in an eight-hour working day.  (Tr. 656).  He checked that claimant would need to take unscheduled breaks during a work day for 45 to 60 minutes, and have to rest less than five minutes before returning to work, due to fatigue.  (Tr. 657).  He noted that claimant would sometimes need to miss work or leave early less than twice a month.  He checked that he would have side effects from medication of drowsiness/sedation that might have implications for working.

Claimant continued to see Dr. Lazaro for treatment of fibromyalgia and arthritis on a regular basis from December 2, 2009 through March 15, 2012.  (Tr. 666-77).  His symptoms fluctuated during that time.

On December 17, 2009, Dr. Hargrave completed a Treating Physician Questionnaire, in which he indicated that claimant could occasionally lift and carry up to 50 pounds; stand one hour at a time; stand/walk about four hours; and sit more than two hours at a time and about four hours total in an eight-hour working day.  (Tr. 661).  He checked that claimant would sometimes need to take two unscheduled breaks requiring 15 minutes of rest before returning to work due to fatigue, inattention and sleepiness.  (Tr. 662).  He checked that claimant needed to miss work or leave early at least three times a month.

Regarding his alleged mental impairments, claimant began psychotherapy with Ken Boullion, Ph.D., on January 3, 2006.  (Tr. 473).  Following initial psychotherapy, Dr. Boullion diagnosed him with anxiety and depression of a moderate to severe degree.  (Tr. 474).  However,

10

the deterioration of his physical heath soon began to negatively impact his emotional and social adjustment.

On May 29, 2007, claimant was demonstrating symptoms of a major depressive disorder, single episode and severe, and social and generalized anxiety with occasional panic attacks.  (Tr. 474).  He was typically oriented in all spheres, but had increasingly experienced poor short-term memory and recall, and decreased attention and loss of concentration, even leading to an inability to read.  This resulted in the ultimate inability to function in his employment.

Dr. Boullion opined that claimant had reached the point where he was no longer able to function at his job and agency.  (Tr. 475).  His current Global Assessment of Functioning ("GAF") score was 40, and 60 for the past year.  (Tr. 476).

On June 9, 2008, Dr. Boullion stated that claimant's current GAF score was 45, and 60 was the highest level in the past year.  (Tr. 483).  His symptoms included depression, insomnia and sleep disturbance, loss of appetite and libido, loss of energy, social anxiety, decreased attention and concentration, and anger.  He was having psychotherapy every 10 days.  (Tr. 480-81).  Dr. Boullion stated that it was "unknown at this time" how long claimant's work restrictions/limitations would continue.  (Tr. 484).

Claimant also saw Warren C. Lowe, Ph.D., for therapy and medication management.  On June 9, 2008, he reported difficulty sleeping and having "a couple of little anxiety attacks."  (Tr. 552).  He had not played golf in about three weeks because of his ongoing pain.  He was taking Lexapro 20 mg., which was helpful.

On July 14, 2008, claimant reported that his mood was less depressed, but he experienced periods of anger and irritability.  (Tr. 555).  He was able to play golf twice in the previous month,

but not well because of the pain.  He stated that he believed that "his golfing days are coming to an end because he has difficulty gripping the club."

On August 12, 2008, claimant reported having a recent panic attack where he could not catch his breath.  (Tr. 554).  Dr. Lowe changed his medication to Abilify.  On September 10, 2008, claimant reported that his mood was improved on Abilify.  (Tr. 553).

Claimant reported on November 10, 2008, that he was having good days and bad days physically.  (Tr. 551).  He had tried to play golf on occasion when he had a good day and was not in so much pain.  Dr. Lowe opined that despite claimant's ongoing physical problems, he was slowly improving.  He stated that claimant was engaging in more activities and overall appeared less anxious and depressed.

On January 12, 2009, Dr. Lowe found that claimant was doing "fairly well."  (Tr. 613). His mood had improved with his medications, although he still had periods of dysphoria and anxiety.  Claimant reported on February 16, 2009, that he had played golf on a few occasions, which usually aggravated his pain.  (Tr. 612).  He had improvement in mood, although he still had periods of depression and anxiety, which were not as intense as in the past.

On July 8, 2009, claimant reported a decline in his mood.  (Tr. 611).  He resumed Abilify and continued with Lexapro 20.  On October 7, 2009, Dr. Lowe stated that claimant appeared to be doing fairly well overall.  (Tr. 664).

Claimant was consultatively examined on May 15, 2009, by David E. Greenway, Ph.D. (Tr. 583).  He complained of anxiety, for which he was taking Xanax.  (Tr. 584).  He had a driver's license, managed money, shopped, cooked, and helped his wife keep the home clean.  He

had regular social contact, played golf as a hobby, worked about 22 hours per week as a teacher, played with his children, and took care of his daily responsibilities.

On examination, claimant displayed no difficulty in speech.  (Tr. 585).  His receptive skills were good.  His affective expression was dysphoric with limited variability.  He said that he felt chronically stressed and pressured.

Insight and judgment and social skills appeared adequate.  He was alert and orientated.  Attention and concentration were adequate.

Recent and remote memories appeared intact.  Behavioral pace, effort and persistence were adequate.  Intelligence was estimated in the average range of intellectual functioning.

Dr. Greenway's diagnoses were major depression, recurrent (moderate), anxiety disorder NOS (chronic, mild to moderate – features of GAD [generalized anxiety disorder] and OCD [obsessive-compulsive disorder]), and pain disorder with both psychological factors and a GMC (general medical condition).  Claimant's GAF score was 60 for the past year.  He had mild to moderate affective problems with recurrent depression and chronic anxiety.  He had good ADLs (activities of daily living), and was socially stable with a part-time job.

Dr. Greenway stated that claimant's mental and physical problems appeared to interact.  He stated that claimant's cognitive skills were adequate to understand, remember and carry out detailed instructions, and to maintain attention to perform simple repetitive task for two-hour blocks of time.  His ability to handle job stress was poor to fair.  He appeared to experience an increase in other symptoms as stress increased.

Dr. Greenway opined that claimant could sustain effort and persist at a slow to moderate pace over the course of "at least part of each workday," such that he maintained "part-time

employment." (Tr. 586). His social skills were adequate, and he should be able to relate to others, including supervisors and co-workers, in employment settings.

On May 28, 2009, Joseph Kalher, Ph.D., completed a Psychiatric Review Technique, in which he found that claimant's anxiety disorder, NOS, and major depressive disorder were medically determinable impairments that did not precisely satisfy the listing of impairments. (Tr. 593, 595). He determined that claimant had no restriction of activities of daily living; mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 600). Dr. Kahler concluded that claimant retained the mental capacity for moderately complex, familiar, low stress work. (Tr. 602).

In the Mental Residual Functional Capacity ("RFC") Assessment, Dr. Kahler found that claimant was moderately limited in his ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and accept instructions and respond appropriately to criticism from supervisors. (Tr. 604-05).

## B. Hearing Testimony

At the hearing held on March 4, 2013, claimant was 49 years old. (Tr. 99). He testified that he was five feet 11 inches tall and weighed 215 pounds. He had a driver's license and was able to drive. He did very little housework. (Tr. 102).

Claimant testified that he had a Bachelor's Degree in Business Administration from Louisiana State University. (Tr. 99). He had 24 hours in graduate courses in counselor

14

education at the University of Louisiana at Lafayette ("ULL").  (Tr. 91, 100).  He had worked in

the financial service business as a bookkeeper, director of finance, compliance officer and

financial advisor from December of 1990 through February 15, 2007.  (Tr. 65, 100).

On October 20, 2008, claimant started working part-time for Remington College for 15

hours per week as a teacher.  (Tr. 62, 89).  He stated that he went from teaching two to three

classes in April, 2009.  (Tr. 89).  His employment ended in April of 2011, when he was offered a

job with. Dupre Carrier Godchaux as a compliance officer and financial advisor.  (Tr. 105-06).

Claimant started working with Dupre Carrier Godchaux on June 1, 2011, earning about

$4,000 per month.  (Tr. 87).  His employment ended on January 15, 2013, because his anxiety

levels increased and he had a panic attack.  (Tr. 109).  He said that he did not really deal well

with people any more, and had a phone phobia.

Claimant reported that he was currently taking two graduate school courses.  (Tr. 108).

He said that he was having trouble concentrating, and that it was very stressful mentally for him.

(Tr. 109).  He complained that his physical problems exacerbated his depression and anxiety.

(Tr. 110).  He stated that he was getting psychological treatment from Dr. Lowe and Sarah

Sullivan, a college intern with Anthetics Psychology Center, once a week.  (Tr. 102).

Regarding physical complaints, claimant testified that he had osteoarthritis in his hands

and wrists.  (Tr. 103).  His medication helped, but did not totally relieve his symptoms.  (Tr.

101).  He had side effects including sleepiness, headaches and constipation.

Claimant stated that he could not work full-time because of pain and inflammation in his

back, shoulder, neck, wrists, hands and feet.  (Tr. 61, 67).  He had also been diagnosed with

narcolepsy in 2004, and had high blood pressure.  (Tr. 68).  Additionally, he complained of severe anxiety and depression.

As to limitations, claimant reported that he could stand and sit for an hour to an hour and a half before having pain.  (Tr. 101).  He stated that he could lift a gallon of milk and lift about a 20-pound bag of potatoes with one arm.  (Tr. 102).  He could type on a keyboard for 15 to 20 minutes before having problems with his hands.  (Tr. 103).

Tommy T. Steegall, Ph.D., Medical Expert ("ME"), considered listings 12.04, 12.06 and 12.07 of the mental health impairments.  (Tr. 92).  He opined that claimant did not meet the B criteria for any of those listings, considering his ability to work, his taking graduate work at ULL, and the information regarding his activities of daily living in Dr. Greenway's report.  (Tr. 96-97). He noted that claimant had a combination of physical and psychological issues that were interactive, apparently both psychosomatic and somatic psychic issues.  (Tr. 97).  He rated claimant's restriction of activities of daily living and difficulties in maintaining social functioning as mild; difficulties in maintaining concentration, persistent or pace as moderate, and no chronic problems with episodes of decompensation.

Dr. Steegall testified that the only information as to an impairment that would limit or prevent claimant from working was provided by Dr. Boullion.  (Tr. 97).  He noted that Dr. Boullion had indicated that claimant had resigned from his job on February 14, 2007, secondary to his multiple physical health problems and the deterioration of his ability to function on the job. However, he noted that Dr. Lowe indicated that as of 2009, claimant had improved and was doing fairly well.  (Tr. 98).

Regarding claimant's physical impairments, Dr. Steegall noted that Dr. Lazaro had indicated that claimant was feeling good back at work and his activities of daily living were considered very good.  He observed that Dr. Lazaro did not think claimant had a tear of the rotator cuff muscle.

Donald Rue, Vocational Expert ("VE"), classified claimant's past work as compliance officer as sedentary with a Specific Vocational Preparation ("SVP") of 8; investment executive as sedentary with an SVP of 7, and business education instructor as light with an SVP of 8.  (Tr. 113).  The ALJ posed a hypothetical in which he asked the VE to assume a 49-year-old claimant with 17 years of education, who had the exertional ability to perform medium work, limited to sitting and standing for one hour to one-and-a-half hours continuously at one time, and simple, routine, repetitive tasks.  (Tr. 113-14).  In response, Mr. Rue testified that he could work as a price marker, of which there were 267,662 positions nationally and 3,323 statewide; housekeeper, of which there were 132,291 positions nationally and 2,351 statewide, and order filler, of which there were 151,299 positions nationally and 1,878 statewide.  (Tr. 114).

Claimant's attorney changed the hypothetical to assume a claimant who was limited to light work, and could only reach and handle occasionally and perform simple, routine and repetitive tasks.  (Tr. 115).  In response, Mr. Rue testified that claimant could not perform his past work or any of the positions identified in response to the hypothetical.  When claimant's counsel asked whether a claimant could maintain any employment if he missed over three to four days a month due to symptoms of depression and anxiety, Mr. Rue stated that he would not.  (Tr. 116).

## C. Argument

Claimant argues that: (1) the ALJ erred in failing to find excessive daytime sleepiness and/or narcolepsy a severe impairment at step two of the sequential evaluation process; (2) the ALJ erred in failing to include any manipulative limitations in his residual functional capacity ("RFC") assessment, and (3) the ALJ failed to properly evaluate the treating source medical opinion evidence.  Because I find that the ALJ failed to properly evaluate the opinions of claimant's treating physicians and the side effects from his medications, I recommend that this matter be **REVERSED** and that the claimant be awarded benefits.

First, claimant argues that the ALJ failed to find excessive daytime sleepiness and/or narcolepsy a severe impairment at step two, citing *Loza v. Apfel*, 219 F.3d 378, 390 (5th Cir. 2000), and *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).  In *Loza*, the Fifth Circuit reiterated the *Stone* standard as follows: "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on an individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  (emphasis added).  *Id*. at 391 (*citing Stone*, 752 F.2d at1101).

In censuring misuse of the severity regulation, the court in *Stone* forewarned that the Fifth Circuit would "in the future assume that the ALJ and the Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) is used."  (emphasis added).  *Loza*, 219 F.3d at 391 (*quoting Stone*, 752 F.2d at 1106).

18

The SSA's Program Operations Manual (the "Program Manual"), provides some guidance on the "Evaluation of Narcolepsy." *Mills v. Astrue*, 2012 WL 3780304, *12 (S.D. Texas Aug. 15, 2010, *12 (*citing Program* Operations Manual Systems ("POMS") DI 24580.005, Evaluation of Narcolepsy).  The Program Manual states that, "[a]lthough narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.03, Epilepsy – Minor motor seizures." (*Id*.). Listing 11.03 describes "nonconvulsive epilepsy," which includes:

> [A] detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.03.

"Narcolepsy," is defined in the Program Manual as "a chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep accompanied by three accessory events: [c]ataplexy," "[h]ypnagogic hallucinations," and "[s]leep paralysis." POMS DI 24580.005, Evaluation of Nacolepsy, (A).  *Mills*, at *12.  The Program Manual also recognizes that "[n]ot all individuals will have all of the symptoms."  *Id*.

In the Decision, the ALJ found that while claimant had been diagnosed with narcolepsy, he had a good response to treatment with medication.  (Tr. 16).  He noted that Dr. Lazaro's records reflected that in March, 2010, claimant's new medicine (Nuvigil) was working much better than the old (Provogil), lasted longer, and allowed him to be much more awake and alert. He further observed that claimant had not required frequent intervention, emergency room treatment, or hospitalization for narcolepsy, and was able to perform all activities of daily living,

including driving.  (Tr. 16-17).  Thus, he concluded that claimant's narcolepsy was no more than a slight abnormality, and not a severe impairment.  (Tr. 17).

Claimant argues that the ALJ erred in failing to consider Dr. Hargrave's opinion regarding his narcolepsy.  Dr. Hargrave noted that test results were negative for narcolepsy, which made that diagnosis unlikely.  (Tr. 625).  However, he wrote in the Treating Physician Questionnaire that claimant would sometimes need to take two unscheduled breaks requiring 15 minutes of rest before returning to work due to fatigue, inattention and sleepiness, and would need to miss work or leave early at least three times a month.  (Tr. 662).  Thus, the records indicate that claimant's sleep problems were more than just a slight abnormality, such that they would be expected to interfere with the individual's ability to work.  Accordingly, the ALJ's failure to consider such opinion constitutes error.

Next, claimant argues that the ALJ's residual functional capacity assessment is not supported by the evidence, citing Social Security Ruling 96-8p, which provides, in pertinent part, as follows:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g*., laboratory findings) and nonmedical evidence (*e.g*., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e*., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

SSR 96-8p (July 2, 1996).

Claimant asserts that the ALJ's RFC assessment fails to meet controlling legal standards because he failed to include any limitations due to claimant's arthritis in his wrists, hands, and

thumbs, including fingering or handling.  While the ALJ considered the records from Drs. Natchimson and Lazaro, he noted that claimant had improved with medication use and physical therapy.  (Tr. 19-20).[5]  Further, claimant's treating rheumatologist, Dr. Lazaro, did not find any limitations as to reaching, handling, feeling and fingering.  (Tr. 657).  Thus, this argument lacks merit.

Finally, claimant argues that the ALJ failed to properly evaluate the treating medical source opinions from Drs. Lazaro and Hargrave.  The ALJ noted that both doctors had completed questionnaires regarding their opinions on claimant's RFC capacity.  (Tr. 20-21).  However, he rejected their opinions on the grounds that "no specifics were provided to back up those statements."  (Tr. 20).  Additionally, he noted that these treating physicians' restrictions appeared to contradict claimant's own report to Dr. Abron regarding the extent of his activities.  (Tr. 21).

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . .  other substantial evidence."  *Newton*, 209 F.3d at 455.

---

[5]If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability.  *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.  *Id*. at 456; *Greenspan*, 38 F.3d at 237.

Here, the ALJ rejected the opinions of his treating physicians, Drs. Lazaro and Dr. Hargrave, on the grounds that they were unsupported by objective evidence.  In the Treating Physician Questionnaire, Dr. Hargrave stated that claimant would sometimes need to take two unscheduled breaks requiring 15 minutes of rest before returning to work due to fatigue, inattention and sleepiness, and would need to miss work or leave early at least three times a month.  (Tr. 662).  Dr. Lazaro found that claimant would need to take unscheduled breaks during a work day every 45 to 60 minutes, and have to rest less than five minutes before returning to work, due to fatigue.  (Tr. 657).  He also stated that claimant would sometimes need to miss work or leave early less than twice a month because of drowsiness/sedation.

In *Myers v. Apfel*, 238 F.3d 617 (5th Cir. 2001), the Fifth Circuit held that an ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization.  *Id*. at 621 (*citing Newton*, 209 F.3d at 456); 20 C.F.R. §§ 404.1527(c) and 416.927(c).  A review of the record indicates that while the ALJ mentioned Drs. Lazaro and Hargrave's statements in his decision, he did not consider the *Myers* factors.  (Tr. 18-21).  The undersigned finds that this constitutes error.

Additionally, the records indicate that claimant was engaging in part-time employment, but could not maintain a full-time job due to his medical impairments.  The consultative psychologist, Dr. Greenway, opined that claimant could sustain effort and persist at a slow to moderate pace over the course of "at least part of each workday," such that he maintained "*part-time* employment."  (emphasis added).  (Tr. 586).  Further, the vocational expert, Mr. Rue, indicated that claimant could not maintain any employment if he missed over three to four days a month.  (Tr. 116).  Dr. Hargrave confirmed that claimant would need to miss work or leave early at least three times a month.  (Tr. 662)

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time.  *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (*citing Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)).  According to claimant's treating physicians, the consultative psychological examiner, and the vocational expert, claimant would be unable to maintain gainful employment.  Thus, the ALJ erred in his determination that claimant retains the capacity to work full-time.

Further, the undersigned notes that the ALJ failed to consider the side effects from claimant's medications.  The records indicate that claimant was taking Darvocet and Hydrocodone, which are narcotic/opioid medications designed for the relief of moderate-to-severe pain, and are also known to cause drowsiness/sedation.  (Tr. 355, 364, 391). Additionally, he was prescribed Abilify, Ambien CR, Xanax, Cyclobenzaprine, Diclofenac, Alprazolam, Lexapro and Lyrica, which are also known to cause drowsiness.  (Tr. 355, 364-68,

393-99, 652). Dr. Lazaro indicated that claimant would have medication side effects of drowsiness/sedation that might have implications for working. (Tr. 657). Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (*citing* 20 C.F.R. § 404.1529(c)(3)(iv)). The ALJ failed to do so; thus, he committed error.

Accordingly, the undersigned recommends that the Commissioner's decision be **REVERSED**, and that the claimant be awarded appropriate benefits commencing February 15, 2007.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE**

**DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V.*
*UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed this 17th day of February, 2016, at Lafayette, Louisiana.

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**

25